UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CORY DONALD,

      Petitioner,

v.                                                          Case No. 09-cv-11751
                                                            HON. AVERN COHN

LLOYD RAPELJE,

      Respondent.
_____/


**MEMORANDUM AND ORDER**
**CONDITIONALLY GRANTING PETITION FOR A WRIT OF HABEAS CORPUS**

**I.  Introduction**

      This is a habeas case filed by a state prisoner under 28 U.S.C. § 2254.  Michigan

prisoner Cory Donald (Petitioner) is incarcerated by the Michigan Department of

Corrections at the Carson City Correctional Facility in Carson City, Michigan.  Petitioner

is serving a life sentence for first-degree murder along with a concurrent sentence of

ten-and-one-half to twenty years for armed robbery.  His convictions occurred following

a jury trial in the Circuit Court in Wayne County, Michigan.  Petitioner, who was sixteen-

years old at the time of the crime, was tried with co-defendants, Rashad Moore and

Dewayne Saine under an aiding and abetting theory.  Petitioner contends that he is

entitled to habeas relief because his counsel was absent during a portion of the

prosecution's case-in-chief, in which a detective was testifying about phone calls made

around the time of the crime from three of the co-defendants' cell phones.  Respondent,

through the Michigan Attorney General's office, filed a response, contending the claim

lacks merit.

The parties filed briefs and the Court heard oral argument.  The matter is now ready for decision.  For the reasons that follow, the Court concludes that Petitioner's convictions are unconstitutional based on counsel's absence during a critical stage in the proceedings and counsel was otherwise ineffective.  According, the petition will be conditionally granted.

## II.  Background

### A.  Trial Testimony

Petitioner's troubles in this case arise because of a shooting on November 14, 2005, in Dearborn, Michigan, which resulted in the death of Mohamed Makki. Makki was shot and killed during a robbery at a home from which he distributed marijuana. Petitioner and codefendants Moore and Saine were charged with the murder.  They were tried together.  Petitioner and Saine shared a jury, while Moore had a separate jury.  Testimony displayed the following pertinent facts.

The prosecution's theory was that an acquaintance of Makki, Fawzi Zaya, along with Petitioner, Moore, Saine, and Seante Liggins planned, and played different roles in, the robbery in which Moore shot and killed Makki.  Moore and Petitioner entered the house together and committed the murder and the robbery. Although Moore pulled the trigger, Petitioner was guilty of the murder under an aiding and abetting theory. Petitioner was shot by Moore during the incident and blood from his wound was the only forensic evidence presented in reference to him.  The prosecution's case hinged on the testimony of Liggins, its key witness, and Michael McGinnis, a drug runner present during the murder, but only able to hear what went on and was not an eyewitness to the actual murder.  Liggins was facing a life sentence and chose to cooperate; he was

2

charged with felony murder but entered into a plea agreement with the prosecution where he pleaded guilty to one count of second-degree murder, with a sentence of ten to twenty years in prison.  McGinnis was arrested on drug charges stemming from the involvement in this case and was placed on probation.  Petitioner's defense was that he was "merely present" and did not participate in any way.

According to Liggins's testimony, Moore drove him and Saine to a parking lot where they met Zaya.  They all got into Zaya's van.  They were drinking alcohol and smoking blunts of marijuana.  Moore sat in the front seat, while Saine and Liggins sat in the back.  Petitioner was not in the van.  Zaya said he wanted them to rob Makki.  Cellular telephone records showed that seven calls were placed from Saine's phone to Moore's phone between 8:17 a.m. and 8:32 a.m., on the day of the murder.  Records also showed that Moore had called Zaya twice that afternoon.

Saine, Liggins, and Moore then went to a house where they continued drinking heavily.  Petitioner was at the house.  According to Liggins, Moore talked to someone on his cell phone, while Petitioner and Saine walked behind the house.  Liggins said he did not see Petitioner with a gun, but as the men walked back to the group, Petitioner was "situating something on his hip" in a way that led him to believe that he had a gun.  Trial Tr. vol. III, 162 Sept. 20, 2006, ECF No. 8-7.

Liggins further testified that Moore said "it's about that time," which Liggins interpreted as meaning that it was time to do the robbery.  Trial Tr. vol. III, 159 Sept. 20, 2006, ECF No. 8-7.  Petitioner, Saine, and Moore were together when Moore made the statement.  Liggins said there were numerous phone calls between Moore, Saine, and

3

Zaya throughout the evening.

Petitioner, Liggins, and Moore then got into a white Taurus.  Liggins did not see where Saine went.  The men were dressed in black skull caps and black coats.  Liggins saw a ski mask in the car on the back seat but could not recall if anyone put it on.

Moore instructed Liggins to drive.  Moore sat in the front passenger seat and talked on his cell phone while Petitioner sat in the back seat.  Moore directed Liggins as he drove.  Following Moore's directions, Liggins ended up at a house in Dearborn, Michigan.  He was not familiar with the house.  He remained inside the car while Petitioner and Moore got out.  He did not see either man with a gun. Petitioner and Moore went inside the house.

Liggins testified that, when Petitioner and Moore returned to the car, both were carrying guns.  He was not sure what type of gun Moore had, but Petitioner's gun looked like a nine-millimeter handgun.  He had previously seen Saine carrying that gun. Liggins saw blood on the leg of Petitioner's pants. Petitioner told him that Moore shot him.

Liggins further testified that he drove Petitioner and Moore away from the house. He said Moore asked Petitioner, "what you get?"  Trial Tr. vol. III, 170 Sept. 20, 2006, ECF No. 8-7.  When Petitioner replied, "320," *id.*, Moore said, "that's it?" "We got to go back."  *Id.*  Liggins then saw Saine's car parked a couple of blocks away.  Saine was in the car.  Petitioner jumped out of his car and got inside Saine's car.

McGinnis also testified.  He was a drug runner for Makki and was inside the house at the time of the incident.  The men sold drugs together and he was there to pay off a drug debt and to purchase more marijuana.  He was watching television and talked

4

to Makki as he got ready for work.  Over the course of about twenty or thirty minutes, Makki received several phone calls.  They were about to leave the house when they heard a creak near the front door.  Makki went to the door and McGinnis heard him say, "oh, shit."  Trial Tr. vol. II, 154 Sept. 19, 2006, ECF No. 8-6.  McGinnis said Makki put his hands over his head as the door swung open and a man entered with a handgun.  The intruder was a black man, wearing a knit cap, a face mask, and a Carhartt jacket.

McGinnis further testified that Makki then backed into the room.  McGinnis said he laid face-down on the floor with his hands on top of his head and could only hear what went on the rest of the time.  He heard two people moving around the house.  He heard scuffling in the kitchen and heard someone other than Makki say, "let it go."  Trial Tr. vol. II, 156 Sept. 19, 2006, ECF No. 8-6.  He then heard two gunshots.  After the shots were fired, one of the intruders stood over him with a gun.  While searching his pockets, the man said, "what you got, what you got" and "he keep the shit in the basement."  *Id.* at 157, ECF No. 8-6.  The man took $300 and a cell phone from him.  McGinnis heard the second person walking downstairs into the basement.  The man soon returned from the basement and said, "I got shot, I got shot" to the person who had been standing over him with the gun.  *Id.* at 158, ECF No. 8-6.  The men then left.

McGinnis then got up, looked in the kitchen and saw Makki sitting with his back against the refrigerator.  McGinnis took a bag of marijuana from the kitchen counter and put it in the trunk of his car.  He also hid $2,400 in the trunk of his car.  He then went to neighboring houses to get help.

At the second house, McGinnis met Caressa Stanford.  According to Stanford, McGinnis told her that two men wearing masks forced their way into the house and

5

robbed them.  He told her that one of the men stood over him with a gun and that there was a fight during which he heard gunshots.  McGinnis and Stanford then went inside Makki's house and saw him lying on the floor.  They drove to a nearby gas station and called the police.

The police were at Makki's house by the time McGinnis and Stanford returned. Makki was pronounced dead at the scene.  Officer James Herberger responded to the call and found him lying in the kitchen.

Dearborn Police Officers Mark Gorby and Ashley Tapping were in the area, when they saw a white Taurus stopped in the middle of the road.  The Taurus slowly passed the officers as they began to pull the patrol car into the street.  The Taurus then stopped near the curb, two or three car lengths in front of the officers.  When Officer Tapping drove the patrol car alongside the Taurus, Officer Gorby saw two people in the front seat.  The Taurus then cut in front of the patrol car.  The officers attempted to stop the Taurus, but the car drove away, running three or four stop signs before coming to a dead-end street.

The officers saw the driver of the Taurus jump out of the car as it came to a stop. That man fled on foot.  Officer Gorby saw a black object being tossed from the car.  As the officers approached with their guns drawn, Moore stepped out of the passenger-side door, with his hands in the air.  Moore told them that he had just been picked up at the bus stop and had no idea what was going on.

Officer Gorby retrieved the black object and discovered that it was a black knit cap containing small baggies of marijuana.

The evidence technician who examined the Taurus after it was impounded found

6

a black, nine-millimeter handgun on the front passenger's side floorboard and a black-knit mask on the front passenger seat. McGinnis's cell phone was on the driver's side floorboard. A do-rag was on the driver's side of the back seat. A black-knit cap also was found on the passenger's side of the back seat.

Officer Gorby searched Moore at the police station. Moore was wearing a black Carhartt jacket and black pants. He also found keys, a Sprint cell phone, a wallet containing $31 and $2,020 that was tucked inside the waistband of Moore's underwear. The keys were for Makki's house and his truck.

DNA testing showed that Petitioner's blood was found on the barrel of the gun, a cellophane wrapper found on the front passenger floorboard, and three samples of carpet from the front passenger floor. Moore's blood was found on another cutting of carpet taken from the front passenger floor. Moore's DNA also was recovered from the black-knit cap.

Makki died of a single gunshot wound to the back. There was a hole in Makki's vest and shirts; gunshot residue also was found on the vest. A spent bullet was recovered from the waistband of his pants. In the living room of the home, the police found a spent bullet on a chair, a live nine-millimeter bullet on the floor, and two spent nine-millimeter casings, one of which was near the entrance to the dining room. The nine-millimeter handgun found in the Taurus fired the spent cartridges and the spent bullets.

McGinnis told the police about the robbery. Initially, he said he was at Makki's house because they were going to go to the casino. When McGinnis learned that Makki had died and that the police would search the car in which he had hidden the drugs and

money, he told the police about those items.

Liggins was arrested a few hours after the murder.  After fleeing the car, he had jumped over fences and discarded his coat and skull cap.  He initially told the police that he was with his girlfriend at her aunt's house until 2:00 or 2:30 in the morning.  He said they left the house to go to a show.  He said his girlfriend kicked him out of the car because he called her another girl's name by mistake. He said he walked to a liquor store and bought a bottle of gin.

On the day Liggins was arraigned on murder charges, he made another statement to the police.  He said Moore and another man picked him up and that he had asked Moore to buy a bag of weed.  Moore asked him to drive.  They went to a house in Dearborn.  He said Moore and another man went into the house, and about four or five minutes later, he heard two or three shots.  He said he was about to leave when the two men ran back to the car.  Moore was holding a gun. He said he panicked and drove off. At trial, Liggins admitted that he did not tell the truth in his statement.  He said he knew Moore was already in custody.  He did not name Petitioner and Saine because he did not want to turn in his friends.

Saine was arrested on December 2, 2004.  During questioning, Saine told a detective that he took Petitioner to the hospital because he had been shot.

## B.  Admission of the Phone Calls

In addition to relying on McGinnis's and Liggins's testimony, the prosecution used phone records to tie all of the men together on the day of the murder.  Calls were made from the phones of Zaya, Moore, and Saine throughout the day, specifically around the time of the offense.  That evidence was admitted through Detective Gary

Marcetti.

In conference outside the presence of the jury, Saine's attorney objected to the

introduction of the exhibit.  Petitioner's attorney did not object, stating "I don't have a

dog in this race.  It doesn't affect me at all."  Trial Tr. vol. IV, 67 Sept. 21, 2006, ECF No.

8-8.  After the judge ruled the chart admissible, a short break was taken before the

judge called the jury back into the courtroom.

When the proceedings resumed, Petitioner's attorney was not present. Although

the trial court initially stated that he would wait for Petitioner's attorney to return, he

ordered the trial to resume since Petitioner's attorney said the exhibit did not relate to

his client.  The trial court neither informed Petitioner of his right to have counsel present

before the testimony resumed nor asked for his consent to proceed with the testimony

in the absence of his counsel.[1]  The record shows the following exchange took place in

the presence of the jury:

> The Court:     [Petitioner's trial counsel] stepped away.  We'll wait for him.  I didn't
> realize he was not there, so he should be here momentarily.
> Are we going on with the chart next that we just did beforehand?
>
> The Prosecutor:  Yes, sir.
>
> The Court:     I think that since we already know [Petitioner's trial counsel], it
> doesn't apply to his client, we'll go ahead and proceed with that and
> I'll just let him know that's what we're doing, okay, all right.  So if we
> [sic] just talking about that particular matter we have before we had
> the break, let's go ahead and get it done.

Trial Tr. vol. IV, 69 Sept. 21, 2006, ECF No. 8-8.

Petitioner's counsel was absent for approximately fifteen minutes, during which

---

[1]The testimony which took place which Petitioner's counsel was absent is
discussed in detail infra.

9

Sergeant Marcetti was examined by the prosecutor and cross-examined by counsel for

Saine and Moore.  Prior to redirect, the record shows the following:

> The Court:    Just for the record here, note [Petitioner's trial counsel] is now here,
> and up until that point we only were discussing the telephone chart
> that was there, [Petitioner's trial counsel]

> Petitioner's trial counsel:    Yes, your Honor, and as I had indicated on the
> record, I had no dog in the race and no interest in
> that.

> The Court:    I just wanted to have the record reflect that.

*Id.* at 82-83.

In closing argument, the prosecutor used the phone calls to show that Saine and

Petitioner were both involved in the robbery and murder.  She said Saine had been

there to pick up Petitioner, and the proceeds of the robbery, as shown by the times that

the calls were made.  The prosecutor intimated that the calls were proof of the planning

of the robbery, the carrying out of the plan, and the subsequent discussion following the

robbery, and thus, linked all the men together, including Petitioner.

The prosecutor also used a statement given by Saine, which was read into the

record through Detective Marcetti, as further proof of Petitioner's involvement, and in

support of the phone-call testimony.  Saine told the police that he had met his friends

not far from Makki's house in response to a phone call from Petitioner. According to

Saine's statement, Petitioner told him that he had been shot by Moore and needed to go

to the hospital.  Saine said he called Moore, who did not say why Petitioner had been

shot.  In closing arguments, the prosecutor used the phone logs to argue that Saine's

pick-up location was a preplanned and prearranged position set in order to pick up his

buddy that he gave the gun to, who had the cash, and who had been in the basement to

10

get rid of the evidence, referring to Petitioner.

The prosecutor relied on an "aiding and abetting" theory of felony murder for both Petitioner's and Saine's convictions.  The judge instructed the jury accordingly.

### III.  Procedural History

The jury found Petitioner guilty.  He was sentenced as described above.

Petitioner filed a direct appeal with the Court of Appeals, raising the same claim raised in his petition here.  He also filed a supplemental brief concerning the effectiveness of counsel, with respect to the prosecutor's misconduct in vouching for the credibility of Liggins, and the sufficiency of the evidence, with respect to the evidence of premeditation.  The Michigan Court of Appeals affirmed his convictions.  *People v. Donald*, No. 275688, 2008 WL 1061551 (Mich. Ct. App. Apr. 10, 2008).  The Michigan Supreme Court denied leave to appeal.  *People v. Donald*, 482 Mich. 1006 (2008) (Table).

Petitioner neither filed a post-conviction motion with the trial court nor a petition for a writ of certiorari with the United States Supreme Court.  Rather, he filed the instant petition.

### IV.  Standard of Review

Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citations omitted).

More recently, the United States Supreme Court held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. ---, ---, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Section 2254(d) does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, but rather, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the

12

Supreme Court's precedents. *Id.* Indeed, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against *extreme malfunctions* in the state criminal justice systems,' not a substitute for

ordinary error correction through appeal." *Id.* (emphasis added) (citing *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)); *see also Swanigan v. Sherry*, No. 09-2606, 2012 WL 4946291, at *1 (6th Cir. Oct. 18, 2012) (habeas relief is reserved for *extreme malfunctions* by the state courts).

Thus, in order for Petitioner to obtain habeas relief in this Court, "[he] must show that the state court's ruling on the claim being presented in [this Court] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at ---, 131 S.Ct. at 786-87. Additionally, the Court's review of habeas cases is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. ---, ---,131 S.Ct. 1388, 1398 (2011).

## V. Discussion - Absence of Counsel

Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated when his attorney was absent during a portion of the prosecution's case-in-chief in which the lead detective, Detective Marcetti, was testifying about phone calls made around the time of the murder from three of the codefendants' cell phones. He argues that, under the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648 (1984), the temporary absence of counsel gives rise to an irrebuttable presumption of prejudice, and he is entitled to habeas relief because prejudicial testimony was taken while his trial counsel was absent. Respondent counters that no

13

prejudicial testimony was taken during counsel's absence and that Petitioner is not entitled to a presumption of prejudice under *Cronic*.

As explained below, the Court finds that Petitioner was denied counsel at a critical stage, an error that is structural in nature. Thus, he need not demonstrate that the error prejudiced the outcome of his case. *Cronic*, 466 U.S. at 658. Rather, the existence of such a defect requires automatic reversal of the conviction because it infects the entire trial process. *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993) (citations omitted).

## A. Analysis under *Cronic*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. The "plain wording of [that] guarantee thus encompasses counsel's assistance whenever necessary to assure meaningful 'defence.'" *United States v. Wade*, 388 U.S. 218, 225 (1967).

After "the adversary judicial process has been initiated," a defendant has a Sixth Amendment right to counsel to assist him "at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). "This right has been accorded, . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Cronic*, 466 U.S. at 658; *see also Mickens v. Taylor*, 535 U.S. 162, 166, (2002) (same); *Ayers v. Hudson*, 623 F.3d 301, 308-309 (6th Cir. 2010) (same). A "critical stage" is one where there is a reasonable likelihood that counsel's absence will result in substantial prejudice to the defense,

14

meaning that "an opportunity may be irretrieveably lost, or material may come out that may be incurably damaging." *Van v. Jones*, 475 F.3d 292, 315 (6th Cir. 2007); *see also Mempa v. Rhay*, 389 U.S. 128, 134 (1967) (A critical stage is any "stage of a criminal proceeding where substantial rights of a criminal accused may be affected."); *Wade*, 388 U.S. at 224 (a "critical stage" is one "where the results might well settle the accused's fate and reduce the trial itself to a mere formality.").

The absence of counsel at critical stages presents grave potential for prejudice, which may not be capable of reconstruction at trial. *Missouri v. Frye*, --- U.S. ---, ---, 132 S.Ct. 1399, 1405 (2012). A criminal defendant has the right to the advice of counsel at "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Wade*, 388 U.S. at 226 (footnote omitted).

In *Van*, the Sixth Circuit articulated the following in order to determine if an event rises to the level of a critical stage of the proceedings such that a habeas petitioner need not demonstrate actual prejudice:

> 1) A critical stage presents a moment when "[a]vailable defenses may be irretrievably lost, if not then and there asserted." [*Hamilton v. Alabama*, 368 U.S. 52, 53 (1961)].
>
> 2) A critical stage is one "where rights are preserved or lost." [*White v. Maryland*, 373 U.S. 59, 60 (1963)].
>
> 3) Counsel's assistance is guaranteed "whenever necessary to mount a meaningful defence." [*United States v. Wade*, 388 U.S. 218, 225 (1967) (internal quotation marks omitted)].
>
> 4) Determination as to "whether a hearing is a 'critical stage' requiring the provision of counsel depends [] upon an analysis 'whether potential substantial prejudice to defendant's rights inheres in the * * * confrontation and the ability of counsel to help avoid that prejudice.'" [*Coleman v.*

15

*Alabama*, 399 U.S. 1, 9 (1970) (quoting *Wade*, 388 U.S. at 227)].

5) A critical stage holds "significant consequences for the accused." [*Bell v. Cone*, 535 U.S. 685, 696 (2002)].

6) In *Lundberg*, our court defined a "floor" for analysis as to whether a phase in a criminal proceeding may be considered critical.  We do not label as a critical stage "proceedings where even the likelihood of later prejudice arising from the failure to appoint is absent." [*Lundberg v. Buckhoe*, 389 F.2d 154,158 (6th Cir. 1968) (quoting *DeToro v. Pepersack*, 332 F.2d 341, 343-44 (4th Cir.1964))].

*Van*, 475 F.3d at 312.  "Deciding whether a particular part of a criminal proceeding holds consequences, is necessary to mount a meaningful defense, or contains potential substantial prejudice to rights demands an inquiry into the *possibility* of consequences." *Id.* (emphasis in original).  The *Van* Court found that in order to evaluate if a portion of a criminal proceeding is a critical stage, a court "must ask how likely it is that significant consequences might have resulted from the absence of counsel at the stage of the criminal proceeding."  *Id.* at 313.

Here, whether a proceeding is a critical stage depends on whether there was a reasonable probability that Petitioner's case could suffer significant consequences from a total denial of counsel at that particular part of the proceeding, namely when defense counsel was absent when Detective Marcetti was testifying about the phone calls.  The question is whether the testimony is part of the criminal proceedings and whether it is a critical stage.

The last court to issue a decision in this case, the Michigan Court of Appeals, stated:

The record discloses that before counsel's absence, the trial court and the defense attorneys for the other codefendants discussed, outside the juries' presence, a record of cell phone calls that were made to and

16

from codefendant Moore, codefendant DeWayne Saine, and an alleged accomplice, Fawzi Zaya.  Defendant Donald was not linked to any of the telephone calls and defendant Donald's trial attorney informed the court that he was not joining in an objection to the telephone records by the other

codefendants, remarking "I don't have a dog in this race.  It doesn't affect me at all."  When the juries returned, defendant Donald's attorney was absent from the courtroom.  Because the telephone record evidence did not concern defendant Donald, the trial court decided to proceed to take testimony concerning the records without waiting for defendant Donald's attorney to return, explaining "it doesn't apply to his client."  The prosecutor thereafter admitted a chart of the cell phone records, and testimony was received concerning the cell phone records, the phone numbers, and the times of the calls listed on the chart.  Shortly thereafter, defendant Donald's attorney returned.  The trial court remarked that, during counsel's absence, "we only were discussing the telephone chart that was there."

Defendant Donald's attorney responded, "Yes, your Honor, and as I indicated on the record, I had no dog in the race and no interest in that."

Defendant Donald now argues that he is entitled to a new trial without the necessity of showing actual prejudice because his attorney was absent during a critical stage of the trial and, therefore, prejudice must be presumed.  We disagree.

A critical stage is one that holds "significant consequences for the accused."  In this case, defendant Donald's attorney was absent for a brief portion of the trial during which evidence of telephone records was received.  None of the telephone calls were linked to defendant Donald, however, and the telephone record evidence did not directly implicate defendant Donald in the charged crimes.  Both before and after the evidence was introduced, defendant Donald's attorney remarked that the evidence did not concern defendant Donald.  Under these circumstances, we cannot conclude that defense counsel was absent during a critical stage of the trial. Therefore, defendant Donald is not entitled to a presumption of prejudice arising from counsel's absence.

*Donald*, 2008 WL 1061551, at *1-2 (citations omitted).

The Michigan Court of Appeals erred in not applying *Cronic*.[2]  Because

---

[2]Indeed, the Michigan Court of Appeals did not cite *Cronic* at all.  Rather, it framed the claim in terms of ineffective assistance of counsel and applied the Supreme

Petitioner's criminal liability was based on the action of others and the prosecution used the theory of aiding and abetting as a basis for his conviction, *Cronic* does in fact apply, and counsel's conduct, in leaving the courtroom during a critical stage of the proceeding, is presumptively prejudicial. *See United States v. Russell*, 205 F.3d 768, 771 (5th Cir. 2000). *Cronic* applies when a defendant is charged with conspiracy and his counsel leaves the room while testimony was being presented which incriminated the codefendants. *Id.* "As the government builds its case against any co-conspirator, the conspiracy is more clearly established and all of the co-conspirators become more tightly linked." *Id.* at 772. In this case, showing a link between the codefendants with Detective Marcetti's testimony regarding the calls "inferentially increase[s] the taint of guilt" against Petitioner. *Id.* "Evidence relevant to the establishment of the same conspiracy with which any conspirator is charged is likely to be relevant as to any other co-conspirator." *Id.*

Additionally, the Sixth Circuit has held that "[w]hen the government presents evidence probative of a defendant's culpability in criminal activity, or evidence that further implicates a defendant in criminal conduct, that portion of a criminal trial is sufficiently critical to the ultimate question of guilt to trigger the protections of *Cronic*." *Olden v. United States*, 224 F.3d 561, 568 (6th Cir. 2000) (citations omitted); *Atkinson v. United States*, 80 F. App'x 422, 2003 WL 22495831, at *3 (6th Cir. 2003). Because Petitioner's counsel was absent during the taking of testimony which tended to incriminate the codefendants, Petitioner was unable to challenge the "implicit connection

---

Court's decision in *Strickland v. Washington*. This point is discussed *infra*.

18

between himself and his codefendants." *Russell*, 205 F.3d 772; *cf Vines v. United States*, 28 F.3d 1123, 1126 (11th Cir. 1994) (finding that taking evidence relating to a codefendant's guilty is not presumptively prejudicial when the defendant has agreed to counsel's absence). Unlike the defendant in *Vines*, in this case, Petitioner did not consent to counsel's absence.

During the prosecutor's case-in-chief, she called Detective Marcetti to the stand and used a demonstrative exhibit that diagramed a burst of phone calls made around the time of the murder from the phones of codefendants Moore, Saine, and Zaya. Detective Marcetti took the stand during the prosecution's case-in-chief, a critical stage of the proceedings.  *Wade*, 388 U.S. at 226-27; *see also Green v. Arn*, 809 F.2d 1257, 1261-63 (6th Cir. 1987), *vacated on other grounds*, 484 U.S. 806, *reinstated*, 839 F.2d 30 ("It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt.") (citation omitted).  Because defense counsel removed himself from the courtroom, he missed Detective Marcetti's testimony about the phone calls to and from Moore's, Saine's, and Zaya's phones on the day of the murder; testimony that was potentially damaging to his client.

Detective Marcetti testified that, during the initial investigation, he took a statement from Saine about the content of the calls.  Saine said that "youngin" called him to tell him that Moore shot him.  Trial Tr. vol. IV, 214 Sept. 21, 2006, ECF No. 8-8. Saine also said that "youngin" asked him to pick him up.  *Id.*, ECF No. 8-8.  He identified "youngin" as Petitioner.  Since there was no evidence that Petitioner had a cell phone and, since Liggins testified that Moore and Petitioner were together in his car, the jury could have inferred that some of the calls, referred to by Detective Marcetti's testimony,

19

were actually made by Petitioner.  The diagram showed that Saine called Moore twelve
times shortly before and after the murder.

Furthermore, during closing argument, the prosecutor used the burst of calls
around the time of the murder testified to by Detective Marcetti, as well as Saine's
location near the seen, to argue that Petitioner's presence was not coincidental.
Rather, the prosecutor argued that the evidence was critical to
demonstrating conspiracy; both Saine's and Petitioner's involvement was prearranged
and preplanned.  In her closing, she said "that's why these phone records are critical, to
show the contact of all parties to show that this is one conspiracy coming all together."
Trial Tr. vol. V, 130, Sept. 25, 2006, ECF No. 8-9.  Saine "was there already waiting to
pick up [Petitioner], pick up the cash, pick up everything that [Petitioner] took out of that
house."  *Id.* at 136, ECF No. 8-9.  The prosecutor argued that Saine then was
responsible for "reporting back" to Zaya with the proceeds.  *Id.* at 130, ECF No. 8-9.
She said the calls showed that there was an arrangement between Zaya, Saine, Moore,
and Petitioner, thereby refuting Petitioner's "mere presence" defense.  The prosecutor
used the phone-call evidence to paint a broad brush of an overall case against
Petitioner.  Thus, the calls were relevant to his case; they were used to implicate him in
the murder.

The fact that Petitioner was tried with Moore and Saine does not change the
critical-stage analysis, because Petitioner's counsel argued that Petitioner was at the
scene, "merely present," but did not take part in the robbery.  Therefore, the evidence of
codefendants' guilt was essential to his own conviction; it was directly relevant to his
case, as he was charged with aiding and abetting in murder.  The phone calls, along

20

with the evidence of Saine's statement and his presence near the crime scene, tended

to link the defendants together in the criminal conduct.  Petitioner's counsel was not

present during the critical testimony of Detective Marcetti.  Petitioner's counsel's

presence was necessary to keep the taint of conspiracy from spreading to his client.  It

was a lost opportunity that was damaging to Petitioner.

Moreover, the judge also instructed the jury that in order to find Petitioner and

Saine guilty, it must find beyond a reasonable doubt that "the alleged crime was actually

committed by either [Petitioner] or someone else."  Trial Tr. vol. IV, 20 Sept. 26, 2006,

ECF No. 10.

Against this backdrop, Petitioner was denied counsel during that stage of the

proceedings; his rights under the Sixth Amendment were violated.  The Michigan Court

of Appeals's decision, to apply a *Strickland* analysis, rather than a *Cronic* analysis to

Petitioner's case, was an "*extreme malfunction*," *Harrington*, 562 U.S. at ---, 131 S.Ct. at

786-87 (emphasis added), and thus an unreasonable application of clearly established

federal law, i.e., the law regarding absence of counsel established in *Cronic*.  *See*

*Mitchell v. Mason*, 325 F.3d 732, 742 (6th Cir. 2003) (explaining that an application of

*Strickland* to a particular case rather than *Cronic*, would either be "an unreasonable

extension of *Strickland* to the facts at hand or an incorrect choice of law in refusing to

apply *Cronic*" ).  Rather, the Court finds that *Cronic* applies.  Petitioner's counsel's

absence during the described critical stage of his proceedings violates his constitutional

rights under the Sixth Amendment and entitles him to habeas relief.

However, even if *Cronic* did not apply to Petitioner's case, counsel's performance

fails under a *Strickland* analysis, as discussed below.

21

### B.  Analysis under *Strickland*

Under *Strickland*, a petitioner must show that counsel's performance fell below an objective standard of reasonableness and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 695 (1984).  In evaluating whether counsel's performance was deficient, "the court must defer to counsel's tactical decisions," avoid "the distorting effects of hindsight" and give counsel the benefit of a strong presumption of reasonableness.  *Id.* at 689.  Prejudice is established if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quotations omitted).

With respect to the performance prong, Petitioner must identify acts that were "outside the range of professionally competent assistance" in order to prove deficient performance.  *Strickland*, 466 U.S. at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  There is a strong presumption that counsel rendered adequate assistance and made all significant decision in the exercise of reasonable professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *Id.* at 686.

The Supreme Court has recently stated that a federal court's consideration of

ineffective-assistance-of-counsel claims arising from state criminal proceedings is quite

limited on habeas review due to the deference afforded trial attorneys and state

appellate courts reviewing their performance.  "The standards created by *Strickland* and

[section] 2254(d) are both 'highly deferential' and when the two apply in tandem, review

is 'doubly' so.  *Harrington*, 562 U.S. at ---, 131 S.Ct. at 788 (internal and end citations

omitted).  "When [section] 2254(d) applies, the question is not whether counsel's actions

were reasonable.  The question is

whether there is any reasonable argument that counsel satisfied *Strickland's* deferential

standard.  *Id.*

The Michigan Court of Appeals, addressing this claim in a single, three-sentence

paragraph, found that *Cronic* did not apply, applied the *Strickland* standard, and denied

relief.  The court of appeals stated:

> Instead, review of defendant Donald's ineffective assistance of
> counsel claim is governed by the test developed in *Strickland*, *supra*,
> which places the burden on the defendant to establish that he was
> prejudiced by counsel's alleged deficient performance.  Defendant Donald
> has not met that burden.  Because defendant Donald was not linked to the
> series of telephone calls, and the telephone record evidence did not
> implicate defendant Donald in the charged crimes, there is no reasonable
> probability that the outcome of the trial would
> have been different had counsel been present during the initial portion of
> this testimony.

*Donald*, 2008 WL 1061551, at *2.

This conclusion is contrary to *Strickland*, because defense counsel's

performance fell below an objective standard of reasonableness and prejudiced

Petitioner.  Counsel exercised bad judgment in removing himself from the courtroom.

Counsel left the courtroom, during the State's case-in-chief, while a prosecution witness

23

testified about cell phone calls that took place around the time of the robbery and murder of Makki, which linked all the defendants together and tended to provide proof of the crime.  Although counsel was able to view the evidence before he left the courtroom, counsel's conduct was unreasonable considering the fact that Petitioner was being tried on an aiding and abetting theory and his defense was "mere presence." Counsel removed himself from the courtroom and from the sight of the jury during a time in the proceedings where Petitioner's substantial rights were concerned, where there was an opportunity for prejudicial testimony to be taken, and where Petitioner neither conceded to his absence nor wanted him to leave.  Counsel's absence deprived Petitioner of a fair trial.

The phone-call evidence was pivotal in linking all defendants together and providing proof of their planning and execution of the murder.  It also linked their behavior after the murder.  The phone-call evidence made a stronger case against Petitioner in that he was more than "merely present," but rather, he participated in the criminal enterprise.  The evidence was critical to his conviction.  In fact, the prosecutor entered a statement into the record, through Detective Marcetti, made by Petitioner's codefendant, Saine, stating that Petitioner had made a phone call to Saine.  "On November 14th I was called by my little homie on Monday is under November 14 (sic). Youngin [Petitioner] to come pick him up because he had been shot and that he was shot by Big Cous [Moore] in the foot and to come pick him up and I did."  Trial Tr. vol. IV 214, Sept. 21, 2006, ECF No. 8-8.

Here, Petitioner's defense, that he was "merely present" during the incident, was being challenged.  The evidence goes directly to the prosecution's burden of proof

24

against Petitioner. Counsel missed his opportunity to cross examine Detective Marcetti regarding his client's association in the criminal enterprise. Had he been present, counsel could have objected to some of the testimony, and if overruled, could have requested a limited instruction as to Petitioner.

Moreover, the trial court's actions contributed to the situation adversely affecting Petitioner. After Petitioner's counsel left the courtroom and the examination of Detective Marcetti began, the trial court did not consult with Petitioner about his attorney's absence. Rather, the trial court, the prosecution, and the other attorneys decided that they could proceed. In such a situation, where the impairment of Petitioner's Sixth Amendment right was easy to identify and prevent, the State acted to further the deprivation. *Strickland*, 466 U.S. at 692.

Respondent's argument that the *Strickland* claims must be given particular deference is not persuasive. *See Knowles v. Mirzayance*, 556 U.S. 111 (2009) (reversing lower court which did not analyze claim under correct *Strickland* standard); *Panetta v. Quarterman*, 551 U.S. 930, 953 (2007) ("the standard [] stated in general terms does not mean the application was reasonable"); *see also Porter v. McCollum*, 558 U.S. 30 (2009) (finding state-court decision regarding *Strickland* prejudice unreasonable).

## VI. Conclusion

For the reasons stated above, the Michigan Court of Appeals (1) erred when it failed to apply *Cronic* and (2) erred in its application of *Strickland.* Petitioner is therefore entitled to habeas relief. The Michigan Court of Appeals' decision was contrary to existing Supreme Court precedent with respect to *Cronic* and was an unreasonable

25

application of the facts as to *Strickland*. In so concluding, the Court is mindful of the deference afforded to state courts on habeas review, which the Supreme Court has recently reiterated. However, the circumstances in this case justify, indeed compel, the federal court intervention to correct errors of constitutional magnitude.

Accordingly, the petition for a writ of habeas corpus is conditionally GRANTED. The State must afford Petitioner a new trial within ninety (90) days from the date of this order or Petitioner may apply for a writ ordering Respondent to release him from custody.

SO ORDERED.


Dated: December 5, 2012                    S/Avern Cohn_____
                                           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 05, 2012, by electronic and/or ordinary mail.

                                           S/Sakne Chami
                                           Case Manager, (313) 234-5160