UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CORY DONALD,

      Petitioner,

v.                                                    Case No. 09-cv-11751
                                                      HON. AVERN COHN
JEFFREY WOODS,

      Respondent.
_____/

## ORDER GRANTING PETITIONER'S MOTION UNDER STRICKLAND (Doc. 39) AND STAYING PROCEEDINGS ON AMENDED PETITION (Doc. 42)

I. Introduction

This is a habeas case under 28 U.S.C. § 2254.  Petitioner Cory Donald is serving

a mandatory and non-parolable life sentence following his conviction for first-degree

murder and a concurrent sentence of ten-and-one-half to twenty years for armed

robbery.  His convictions occurred following a jury trial in Wayne County Circuit Court.

Petitioner, who was sixteen-years old at the time of the crime, was tried with co-

defendants, Rashad Moore and Dewayne Saine under an aiding and abetting theory.

At trial, Petitioner's counsel was absent during a portion of the prosecution's case-in-

chief, in which a detective was testifying about phone calls made around the time of the

crime from three of the co-defendants' cell phones.

As will be explained, the Court granted habeas relief on the grounds that

Petitioner's counsel's absence violated United States v. Cronic, 466 U.S. 648 (1984)

and on the ground that counsel's actions constituted ineffective assistance of counsel

under Strickland v. Washington, 466 U.S. 668 (1984).  Donald v. Rapelje, 2012 WL 6047130 *1-6 (E.D. Mich. Dec. 5, 2012).  The Court of Appeals for the Sixth Circuit affirmed based on Cronic.  Donald v. Rapelje, 580 F. App'x 277, 278-80 (6th Cir. 2014). The Supreme Court reversed the Cronic holding.  Woods v. Donald, 575 U.S. ___, 135 S. Ct. 1372 (2015).  Neither the Supreme Court nor the Court of Appeals considered Petitioner's Strickland claim.

Before the Court is Petitioner's motion to again grant relief based on Strickland. Also before the Court is Petitioner's amended petition in which he asserts claims based on Miller v. Alabama, 132 S. Ct. 2455 (2012) and Montgomery v. Louisiana, 136 S.Ct. 718 (2016).  For the reasons that follow, Petitioner's motion based on Strickland will be granted.  Proceedings on the amended petition will be stayed pending exhaustion of remedies in state court.

## II.  Background

The background was described in detail in the Court's prior decision.  See  The Sixth Circuit also described the background which is repeated in substantial detail below.

> On November 14, 2005, Cory Donald ("Donald") and Rashad Moore ("Moore") entered Mohamed Makki's1 ("Makki") home. While Donald and Moore were inside, Makki was shot and Makki's acquaintance Michael McGinnis ("McGinnis") was robbed. Makki died soon after from the gunshot wounds.
> Much of the information about that day comes from the testimony of Seante Liggins ("Liggins").2 Liggins testified that on the day of the incident, he gathered with Donald, Moore, Dewayne Saine ("Saine"), and Fawzi Zaya ("Zaya") in a Detroit, Michigan, parking lot. R. 8–8 (9/20/06 Trial Tr. at 143). While the men drank alcohol and smoked marijuana, Moore and Zaya discussed robbing Makki. Id. at 253–54. Liggins testified that the gathering moved on to a nearby vacant house where he saw Saine and Donald walk to the back of the house. When Donald returned,

he was situating something on his hip that Liggins believed was a gun. Id. at 162–63. At some point Moore announced to the group that it was time to go "hit the lick," and Liggins, Moore, and Donald got into Liggins's car. Id. at 161, 163. Moore directed Liggins to drive them to a house at 5251 Kendall Street in Dearborn, Michigan. Id. at 164–65. Moore spoke on his cell phone during the drive. Id. at 164. Liggins stopped the car in front of a house at 5251 Kendall Street. He stayed in the car while Moore and Donald entered the house. Id. at 165 .

The only testimony as to what transpired inside the house came from Michael McGinnis. McGinnis testified that a person entered the house wearing a face mask and holding a gun. R. 8–7 (9/19/06 Trial Tr. at 154–55). McGinnis lay face-down on the floor; he heard a person whose voice he did not recognize say "let it go" and then heard two shots. Id. at 156–57. Someone stood over McGinnis, holding a gun to his head and searching through his pockets. Id. at 155–57. The individual took between two hundred and three hundred dollars and a cell phone from McGinnis's pockets. Id. at 161. McGinnis testified that he heard someone walk down the basement stairs, return from the basement, and whisper "I got shot, I got shot." Id. at 158. The individuals left the house and McGinnis went to the kitchen where he found Makki slumped over and gasping for air. Id. at 158. McGinnis first took marijuana from the house and $2,400 in cash that was on his person but not taken during the robbery and put those items in his car and then sought assistance from neighbors, who contacted the police. Id. at 162, 164, 166. The police responded to the house around 8:30 p.m. and pronounced Makki dead. R. 8–9 (9/21/06 Trial Tr. at 74); R. 8–7 (9/19/06 Trial Tr. at 210).

Liggins testified that Moore and Donald were in the house for approximately seven minutes and that he heard two or three gunshots come from the house during that time. R. 8–8 (9/20/06 Trial Tr. at 165, 176). Liggins testified that when Moore and Donald returned to the car, both had weapons and Donald said that Moore had shot him. Id. at 168–69. Liggins drove a few blocks away from Makki's house and saw Saine's parked car. Id. at 171. Donald jumped out of Liggins's car and entered Saine's car. Id. at 172 . Liggins testified that he did not see or hear any phone calls being made during the time between when he left Makki's house and when he encountered Saine. Id. at 172. In a statement to the police, Saine stated that Donald called him and asked Saine to pick him up because he had been shot in the foot. R. 8–9 (9/21 /06 Trial Tr. at 214, 215–16).

Hospital records show that Donald was taken to Sinai Grace Hospital and treated for a gunshot wound to the right foot. Id. at 85. At trial, laboratory technicians testified that Donald's DNA was found on the barrel of the murder weapon, but not on the handle. R. 8–7 (9/19/06 Trial Tr. at 86). Donald's DNA also matched drops of blood on the carpet and a piece of plastic in Moore's vehicle. Id.

3

. . .

At trial, the prosecution argued that Moore, Zaya, Liggins, Saine, and Donald all participated in the plan to rob Makki. The prosecution argued that Moore shot Makki, but that Donald was guilty of felony murder through aiding and abetting. The prosecution relied on testimony and phone records showing calls between cell phones belonging to Zaya, Moore, and Saine during the day, with an increased burst of calls around the time of the incident, to show that the men together planned and executed the robbery and murder. R. 8–9 (9/21/06 Trial Tr. at 71–75). During testimony from Detective–Sergeant Gary Marcetti ("Marcetti"), the prosecution introduced a demonstrative chart diagraming the phone records. Moore's attorney objected and the trial judge excused the jury to hold a conference about the chart. Donald's attorney, *280 Richard L. Cunningham ("Cunningham"), did not join in the objection to the chart. He stated "I don't have a dog in this race. It doesn't affect me at all." Id. at 67. The trial judge ruled that the chart was admissible and took a recess before calling the jury back into the courtroom. Id. at 68.

When the jury returned and the judge prepared to resume testimony, Donald's attorney Cunningham was not in the courtroom. The judge noticed Cunningham's absence and initially said that "[w]e'll wait for him," but after determining that the prosecution was going to continue with the phone-call chart, the judge decided to proceed with the trial. Id. at 69. The trial judge said, "I think that since we already know Mr. Cunningham, it doesn't apply to his client, we'll go ahead and proceed with that and I'll just let him know that that's what we're doing, okay, all right." Id. The judge did not ask Donald if he consented to moving forward without his attorney present. The prosecution continued with Marcetti's testimony. He testified that on the day of the robbery and murder, phone calls were made from Moore's phone to Zaya's phone at 1:54 and 3:19 p.m.; Saine's phone to Zaya's phone at 3:23 and 9:17 p.m.; Saine's phone to Moore's phone at 8:17, 8:19, 8:19, 8:28, 8:32, 8:32, and 8:32 a.m. and 7:06, 7:07, 7:38, 7:41, 8:33, 8:33, 8:33, 8:57, 9:09, 9:14, 9:18, and 9:18 p.m. Id. at 71–75.

Approximately seventeen minutes later, the transcript indicates that Cunningham returned to the courtroom. Id. at 68, 80. The judge informed Cunningham that "up until that point we only were discussing the telephone chart that was there." Id. at 82. Cunningham responded, "[y]es, your Honor, and as I had indicated on the record, I had no dog in the race and no interest in that." Id. at 83. Marcetti proceeded to testify to other matters. Cunningham conducted cross-examination on issues unrelated to the telephone records. Id. at 106–18.

In closing argument, the prosecutor argued that Donald's participation in the planning and execution of the robbery constituted felony murder. The prosecution focused on McGinnis's testimony demonstrating that there were two men in the house who had a plan and worked together, R. 8–10 (9/25/06 Trial Tr. at 118); Donald's connection to

4

the house through his gunshot wound and his DNA on the murder weapon, id. at 117; and the phone calls as indication that the robbery and Saine's pick-up of Donald and the money was pre-planned, id. at 128–32. The prosecutor reminded the jury of Saine's statement to police that Donald called him, and emphasized that "these phone records are critical, to show the contact of all the parties to show that this is one conspiracy coming all together." Id. at 126, 130.

Cory Donald was convicted of one count of felony murder and two counts of armed robbery. R. 8–11 (9/26/06 Trial Tr. at 47–48). Donald was sentenced to the statutorily required prison term of life without the possibility of parole for the felony murder conviction, as well as two concurrent prison terms of ten and one-half to twenty years for the armed robbery convictions. Id. at 47–48.

Donald v. Rapelje, 580 F. App'x 277, 278-80 (6th Cir. 2014) (internal citations omitted).

III.  Procedural History

On December 5, 2012, the Court granted Petitioner a conditional writ of habeas corpus on the ground that his convictions are unconstitutional because counsel's absence during a critical stage in his trial was per se ineffective under United States v. Cronic, 466 U. S. 648 (1984) and on the ground that counsel's actions constituted ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). Donald v. Rapelje, No. 09-cv-11751, 2012 WL 6047130 (E.D. Mich. Dec. 5, 2012).  The State appealed.  The Court of Appeals for the Sixth Circuit, 2-1, affirmed based on Cronic.  Donald v. Rapelje, 580 F. App'x 277 (2014).  The Supreme Court granted certiorari and reversed the Sixth Circuit's Cronic decision.  Woods v. Donald, 575 U.S. ___, 135 S. Ct. 1372 (2015).  On remand, the court of appeals vacated the Court's grant of the writ and remanded for further proceedings.  Donald v. Woods, 12-2624 (June 17, 2015).  Neither the Supreme Court nor the Sixth Circuit addressed Petitioner's Strickland claim.  Presumably, and according to the parties, this left the claim open for the Court to again consider it on remand.

5

Indeed, following the Sixth Circuit's remand, Petitioner filed a motion styled "Motion for Consideration and Grant of Petition for Writ of Habeas Corpus under Strickland v. Washington."  (Doc. 39).  Petitioner again urges the Court to again grant the writ based on a finding that Petitioner's counsel's absence during the trial constitutes ineffective assistance of counsel.  Respondent filed a response, contending that counsel's brief absence did not violate Strickland.  (Doc. 40).

Petitioner filed a motion to amend the petition. (Doc. 31).  Petitioner sought to assert a claim based on the Supreme Court's June 25, 2012 decision in Miller v. Alabama, 567 U.S. ___. 132 S. Ct. 2455 (2012).  In Miller, the Supreme Court held that for a juvenile, a mandatory life without parole sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment.  The Supreme Court subsequently granted certiorari on the question of whether Miller is retroactive.  See Montgomery v. Louisiana, 135 S. Ct. 1546 (2015).  The Court therefore stayed proceedings in the case pending the outcome of Montgomery.  (Doc. 38).

In 2016, the Supreme Court issued its decision in Montgomery, holding, inter alia, that (1) the Supreme Court has jurisdiction to review a state collateral review court's failure to give retroactive effect to a new rule and (2) Miller is a new rule that is retroactive on state collateral review.  Montgomery v. Louisiana, 136 S. Ct. 718 (2016).

In light of Montgomery, the Court granted Petitioner's motion to amend and set deadlines for filing an amended petition and response.  (Doc. 41).  The Court also said that Petitioner's Strickland motion will be addressed once all papers have been filed on the forthcoming amended petition.

Petitioner has filed an amended petition (Doc. 42) to which the State has

responded.  (Doc. 43).

## IV.  Legal Standard

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Relief is bared under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam), quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of

7

petitioner's case." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003) quoting <u>Williams</u>, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S.86, 101 (2011), quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103 (internal quotation omitted).

"Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time - i.e., the record before the state court." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011).

V.  <u>Strickland</u> Claim

A.

A violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was deficient and the deficient

8

performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687

(1984).  An attorney's performance is deficient if "counsel's representation fell below an

objective standard of reasonableness."  Id. at 688.  The defendant must show "that

counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment."  Id. at 687.  "Judicial scrutiny of

counsel's performance must be highly deferential."  Id. at 689.  The Supreme Court has

"declined to articulate specific guidelines for appropriate attorney conduct and instead

[has] emphasized that the proper measure of attorney performance remains simply

reasonableness under prevailing professional norms."  Wiggins v. Smith, 539 U.S. 510,

521 (2003) (quoting Strickland, 466 U.S. at 688) (internal quotes omitted)).

     An attorney's deficient performance is prejudicial if "counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

Strickland, 466 U.S. at 687.  The petitioner must show "a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in

the outcome."  Id. at 694.  Unless the petitioner demonstrates both deficient

performance and prejudice, "it cannot be said that the conviction [or sentence] resulted

from a breakdown in the adversary process that renders the result unreliable."  Id. at

687.

     "The standards created by Strickland and § 2254(d) are both highly deferential

and when the two apply in tandem, review is doubly so."  Harrington, 562 U.S. at 105

(internal citations and quotation marks omitted).  "[T]he question is not whether

counsel's actions were reasonable"; but whether "there is any reasonable argument

that counsel satisfied <u>Strickland's</u> deferential standard." <u>Id</u>.

B.

As noted above, the Court has already found that the Michigan Court of Appeals

made an unreasonable determination of federal law, i.e. misapplied <u>Strickland</u>, in

concluding that Petitioner's counsel was not ineffective and therefore that Petitioner

was entitled to habeas relief. This conclusion has not changed. As explained

previously,

> The Michigan Court of Appeals, addressing this claim in a single, three-sentence paragraph, found that <u>Cronic</u> did not apply, applied the <u>Strickland</u> standard, and denied relief. The court of appeals stated:
>> Instead, review of defendant Donald's ineffective assistance of counsel claim is governed by the test developed in <u>Strickland</u>, *supra*, which places the burden on the defendant to establish that he was prejudiced by counsel's alleged deficient performance. Defendant Donald has not met that burden. Because defendant Donald was not linked to the series of telephone calls, and the telephone record evidence did not implicate defendant Donald in the charged crimes, there is no reasonable probability that the outcome of the trial would have been different had counsel been present during the initial portion of this testimony.
>
> <u>Donald</u>, 2008 WL 1061551, at *2.
> This conclusion is contrary to <u>Strickland</u>, because defense counsel's performance fell below an objective standard of reasonableness and prejudiced Petitioner. Counsel exercised bad judgment in removing himself from the courtroom. Counsel left the courtroom, during the State's case-in-chief, while a prosecution witness testified about cell phone calls that took place around the time of the robbery and murder of Makki, which linked all the defendants together and tended to provide proof of the crime. Although counsel was able to view the evidence before he left the courtroom, counsel's conduct was unreasonable considering the fact that Petitioner was being tried on an aiding and abetting theory and his defense was "mere presence." Counsel removed himself from the courtroom and from the sight of the jury during a time in the proceedings where Petitioner's substantial rights were concerned, where there was an opportunity for prejudicial testimony to be taken, and where Petitioner neither conceded to his absence nor wanted him to leave. Counsel's absence deprived Petitioner of a fair trial.
> The phone-call evidence was pivotal in linking all defendants

10

together and providing proof of their planning and execution of the
murder.  It also linked their behavior after the murder.  The phone-call
evidence made a stronger case against Petitioner in that he was more
than "merely present," but rather, he participated in the criminal
enterprise.  The evidence was critical to his conviction.  In fact, the
prosecutor entered a statement into the record, through Detective
Marcetti, made by Petitioner's codefendant, Saine, stating that Petitioner
had made a phone call to Saine.  "On November 14th I was called by my
little homie on Monday is under November 14 (sic).  Youngin [Petitioner]
to come pick him up because he had been shot and that he was shot by
Big Cous [Moore] in the foot and to come pick him up and I did."  Trial Tr.
vol. IV 214, Sept. 21, 2006, ECF No. 8-8.

Here, Petitioner's defense, that he was "merely present" during the
incident, was being challenged.  The evidence goes directly to the
prosecution's burden of proof against Petitioner.  Counsel missed his
opportunity to cross examine Detective Marcetti regarding his client's
association in the criminal enterprise.  Had he been present, counsel
could have objected to some of the testimony, and if overruled, could
have requested a limited instruction as to Petitioner.

Moreover, the trial court's actions contributed to the situation
adversely affecting Petitioner.  After Petitioner's counsel left the
courtroom and the examination of Detective Marcetti began, the trial court
did not consult with Petitioner about his attorney's absence.  Rather, the
trial court, the prosecution, and the other attorneys decided that they
could proceed.  In such a situation, where the impairment of Petitioner's
Sixth Amendment right was easy to identify and prevent, the State acted
to further the deprivation.  Strickland, 466 U.S. at 692.

Respondent's argument that the Strickland claims must be given
particular deference is not persuasive.  See Knowles v. Mirzayance, 556
U.S. 111 (2009) (reversing lower court which did not analyze claim under
correct Strickland standard); Panetta v. Quarterman, 551 U.S. 930, 953
(2007) ("the standard [] stated in general terms does not mean the
application was reasonable"); see also Porter v. McCollum, 558 U.S. 30
(2009) (finding state-court decision regarding Strickland prejudice
unreasonable).

Petitioner's motion reiterates the points the Court made in granting relief on his

Strickland claim.  Namely, that counsel absenting himself from the prejudicial testimony

of the lead detective during the prosecution's case-in-chief which was used to link all

the defendants together into a planned and executed crime.  Counsel made a serious

error because Petitioner was being tried on an aiding and abetting theory based on the

11

culpability and association with his co-defendants.  The phone calls went directly to
Petitioner's culpability as an aider and abettor and the prosecutor referred to the phone
calls in closing argument to link all of the defendants together.  Counsel's absence
rendered it impossible for any cross-examination which could have distanced Petitioner
from the phone calls and bolstered his defense that he was not involved in the plan.
The Court cannot conclude that there is any reasonable argument that counsel's
absence in this case satisfies <u>Strickland</u>.

Respondent's response simply relies on the deferential review placed on habeas
review of a <u>Strickland</u> claim and reasserts that the Court must defer to the Michigan
Court of Appeals' determination.  To be sure, the standard of review is highly
deferential but it is not toothless.  Even the most deferential review cannot let stand a
clear violation of a constitutional right, particularly the right to counsel, under the
circumstances of this case.  Thus, Petitioner is again entitled to habeas relief based on
<u>Strickland</u>.

## VI.  <u>Miller</u> and <u>Montgomery</u> Claim

### A.

As noted above, Petitioner's amended petition seeks relief on the grounds that
his sentence violates the Supreme Court's decisions in Miller and Montgomery.
Petitioner frames the issues are follows:

> A. Cory Donald's mandatory life without parole sentence for a crime committed
> when he was a juvenile violates the Eighth Amendment, <u>Miller v. Alabama</u>, 567
> U.S. ___, 132 S. Ct. 2455 (2012); and
>
> B. Cory Donald's sentence of life without parole violates the Eighth Amendment
> because the sentence is unconstitutional for a youth convicted of aiding and

12

abetting a felony murder, <u>Miller v. Alabama</u>, 567 U.S. ___, 132 S. Ct. 2455 (2012); <u>Graham v Florida</u>, 560 U.S. 48 (2010); <u>Tison v Arizona</u>, 481 U.S. 137 (1987); <u>Enmund v Florida</u>, 458 U.S. 782 (1982).

Respondent contends that the claims raised in the amended petition should be denied because (1) they are untimely and do not relate back to the date of the original petition, (2) they are unexhausted, and (3) they lack substantive merit. Respondent also says that at a minimum the Court should stay proceedings so Petitioner can exhaust his claims and in particular avail himself of relief in the state courts. Petitioner recognizes that a stay may be appropriate and in fact asks for a stay.

B.

Before considering a stay, it is necessary to set forth the developments in state law since the Supreme Court's decisions. As a back drop, because Petitioner was a youth under 18 at the time of the offense for which he was convicted of felony murder under an aiding and abetting theory and sentenced to mandatory life without parole. <u>See</u> M.C.L. §750.316 (authorizing, before <u>Miller</u> amendment, only mandatory life imprisonment sentence for first-degree murder); M.C.L. §791.234 (providing that the parole board does not have jurisdiction over first-degree murder convictions).

In holding that its decision in <u>Miller</u> applied retroactively, the Supreme Court in <u>Montgomery</u> said "prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption." <u>Montgomery</u>, 136 S.Ct. at 736-37. The holding in <u>Montgomery</u> was intended to "[give] effect to <u>Miller's</u> substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." <u>Id.</u> at 735.

Thus, under <u>Montgomery</u>, Petitioner's current mandatory life without parole

13

sentence appears to run afoul of the Eighth Amendment.  However, Michigan provides a statutory remedy for a the Supreme Court's decisions in <u>Miller</u> and <u>Montgomery</u>.  In 2014, the Michigan legislature passed M.C.L. §769.25 and M.C.L. §769.25a in response to <u>Miller</u>.  The first statute, M.C.L. §769.25, provides new sentencing procedures for a youth, like Petitioner, who was less than 18 years old at the time he committed an enumerated offense, which if an adult would result an automatic life without parole sentence.  <u>See</u> Mich. Comp. L. §769.25(1).  Under this statute, after conviction, the prosecutor must choose whether or not to move for a sentence of life without parole.  <u>See</u> M.C.L. §769.25(2)(b).  If the prosecutor files a motion seeking life without parole, with a statement of reasons, then the court will then have a hearing on the motion.  <u>See</u> M.C.L. §769.25(6).  At that hearing, the court shall consider factors from Miller, such as immaturity at the time of the offense, "familial and peer pressures that may have affected him," and potential rehabilitation.  <u>Miller</u> 132 S.Ct. at 2468; <u>see</u> M.C.L. §769.25(6).  The state court is then required to provide statement of reasons for the sentence imposed.  <u>See</u> M.C.L. §769.25(7).  After the hearing, the state court can sentence the defendant to life imprisonment without the possibility of parole or the court can sentence the defendant for a minimum of at least 25 years and up to 40 years, with a maximum of 60 years.  <u>See</u> M.C.L. §769.25(9).  If the prosecutor chooses not to file a motion seeking the sentence of life without the possibility of parole, the state court must impose a term of years sentence.  M.C.L. § 769.25(4).

The companion statute, M.C.L. §769.25a, provides that the new juvenile sentencing statutes also apply to youth, like Petitioner, who had previously been sentenced to mandatory life without parole.  <u>See</u> M.C.L. §769.25a(2).  Thus, under

14

Michigan law, Petitioner should be entitled to a new sentencing.

Petitioner, however, has not yet received consideration under these statutes.

law.  Michigan law provides that "[w]ithin 180 days after the date the supreme court's

decision becomes final," the prosecutor must file motion(s) seeking resentencing to a

term of life without parole on cases in which the prosecutor is pursuing such a

sentence.  M.C.L. §769.25a(4)(b).  To date, it appears that the prosecutor has not

made a decision in Petitioner's case.[1]  Thus, Petitioner

> requests that this Court hold his habeas corpus petition in abeyance until, at a
> minimum, either the Wayne County prosecutor determines that it will not file a
> motion seeking life without parole for Cory Donald or, if the state is seeking life
> without parole, the subsequent resentencing hearing is held under state law.
> See Rhines v. Weber, 544 U.S. 269, 278-79 (2005) (holding that a District Court
> has "discretion to stay a mixed habeas petition to allow the petitioner to present
> his unexhausted claims to the state court in the first instance, and then to return
> to federal court for review of his perfected petition.")

(Doc. 42 at p. 7).

C.

State prisoners must exhaust available state remedies for each of the claims

presented in a habeas petition before seeking a federal writ of habeas corpus.  28

U.S.C. § 2254(b)(1).  To satisfy this requirement, the claims must be "fairly presented"

---

[1]The Wayne County Prosecutor has been resistant to the Supreme Court's
decisions and Michigan law that provides the mechanisms for implementing the
decisions.  A July 2016 report from the Fair Punishment Project entitled "Juvenile Life
Without Parole in Wayne County: Time to Join the Growing National Consensus?"
describes the Wayne County Prosecutor as "maintain[ing] Wayne County's status as an
extreme outlier" rather than "meaningfully implement[ing] the Supreme Court's limits on
[juvenile life without parole] sentences.  In addition, the issue of juvenile life without
parole sentences and the application of Miller remains unsettled, as evidenced by
litigation pending in this district, see Hill v. Snyder, 10-14568 (E.D. Mich.) and the
concurring and dissenting opinions in the Supreme Court's recent order in Tatum v.
Arizona, No. 15-8850, 137 S.Ct. 11 (Oct. 31, 2016).

to the state courts, meaning that the prisoner must have asserted both the factual and legal bases for the claims in the state courts. McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000). To exhaust a habeas claim in state court, a petitioner must "'present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" Hruby v. Wilson, 494 F. App'x 514, 517 (6th Cir. 2012) (quoting Koontz v. Glossa, 731 F.2d 365, 368 (6th Cir. 1984)). A Michigan prisoner must properly present each issue he seeks to raise in a federal habeas proceeding to both the Michigan Court of Appeals and the Michigan Supreme Court to satisfy the exhaustion requirement. Wagner v. Smith, 581 F.3d 410, 414 (6th Cir. 2009) (citing Hafley v. Sowders, 902 F.2d 480, 483 (6th Cir.1990). While the exhaustion requirement is not jurisdictional, a "strong presumption" exists that a petitioner must exhaust all available state remedies before seeking federal habeas review. Granberry v. Greer, 481 U.S. 129, 131, 134-35 (1987). The burden is on the petitioner to prove exhaustion. Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).

Here, the complex and unusual procedural posture of this case creates "reasonable confusion" regarding the appropriate timing and forum for Petitioner's claims. See Pace v. DiGuglielmo, 544 U.S. at 416 (citing Rhines v. Weber, 544 U.S. 269, 278 (2005)). More specifically, given the possibility of resentencing under Michigan's new juvenile sentencing law, M.C.L. §769.25, Petitioner's first amended claim, concerning the unconstitutionality of mandatory life without parole sentences for juveniles, should be stayed pending application of this statute in the state court. Petitioner's second amended claim, the unconstitutionality of his sentence to life without parole sentence for aiding and abetting felony murder, could also potentially be

16

remedied in state court, if the state chooses not to seek life without parole, or the state court imposes a term of years' sentence, upon resentencing under M.C.L. §769.25.

Under these circumstances, a "protective" habeas petition and request for an abeyance is again appropriate here because of the uncertainty surrounding the state court's resolution of claims identical to those raised by Petitioner

A district court should grant a stay where (1) a petitioner had good cause for his failure to exhaust state remedies, (2) the claims are not plainly meritless, and (3) the petitioner is not engaged in abusive litigation tactics or intentional delay. Rhines, 544 U.S. at 278. Petitioner here has good cause for his failure to exhaust state remedies, as discussed above (procedural history of this case). Further, Petitioner's claims are not plainly meritless, and he has not engaged in abusive or dilatory litigation tactics.

Where, as here, a district court determines that a stay is appropriate pending exhaustion of state court remedies, the district court "should place reasonable time limits on a petitioner's trip to state court and back." Id. at 278. To ensure that Petitioner does not delay in exhausting state court remedies, he must ask the Court to lift the stay within sixty days of exhausting his state court remedies. See id. "If the conditions of the stay are not met, the stay may later be vacated *nunc pro tunc* as of the date the stay was entered, and the petition may be dismissed." Palmer v. Carlton, 276 F.3d 777, 781 (6th Cir. 2002) (internal quotation omitted). At this time, the Court makes no finding as to the timeliness of the claims raised in the amended petition.

## VII. Conclusion

Accordingly, Petitioner's motion based on Strickland is GRANTED. Petitioner is again entitled to habeas relief on this ground.

17

Proceedings on the amended petition are STAYED and further proceedings in this matter are held in ABEYANCE.  Petitioner may file a motion to lift the stay in this Court within sixty (60) days after the conclusion of the state court proceedings.

SO ORDERED.

S/Avern Cohn
AVERN COHN
Dated: December 13, 2016                    UNITED STATES DISTRICT JUDGE
        Detroit, Michigan